Commonwealth *v.* Favors, Appellant.

Submitted September 10, 1973. Before WRIGHT, P. J., WATKINS, JACOBS, HOFFMAN, SPAULDING, CERCONE, and SPAETH, JJ.

*Louis Lipschitz,* and *Lipschitz and Danella,* for appellant.

*Milton M. Stein* and *James T. Ranney,* Assistant District Attorneys, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY WATKINS, P. J., April 3, 1974:

This is an appeal from the judgment of sentence by the Court of Common Pleas of Philadelphia County, after conviction of the defendant, Augustus Favors, of aggravated robbery. He was sentenced to 1-1½ to 8 years.

The case was tried before the trial judge without a jury and he waived his right to jury trial in accordance with Rule 1101, Pennsylvania Rules of Criminal Procedure.

The colloquy record made prior to accepting his waiver is as follows: "Q. You are waiving your right to a jury trial voluntarily and willingly? A. Yes, Sir. Q. Are you satisfied with your representation by Mr. Stanshine (an Assistant Voluntary Defender)? A. Yes, sir. Q. You had a chance to discuss the case thoroughly with him A. Yes, sir. Q. Are you sure? A. Well, not too much in detail. No, sir. Q. You have some serious charges here and we want to make sure that you are ready to defend yourself through your counsel. Do you think you need more time? A. No, sir. No, sir, I don't think I need any more time."

We feel this record colloquy was sufficient to indicate a knowing and intelligent waiver of his right to a jury trial. This position is buttressed by the fact that this was a second time that this man was on trial for the same charges and he waived his right in the first trial. *Commonwealth ex rel. Henderson v. Maroney,* 448 Pa. 411, 293 A. 2d 64 (1972).

As to the suppression of the evidence issue, we hold that the court below properly refused to suppress. The record established that on October 29, 1970, the victim was standing at the intersection of 19th and Jefferson

Streets, Philadelphia, at about 1:00 o'clock a.m., after just having accompanied his sister-in-law from the "Play Bar", located at the intersection, and having escorted her to a taxicab. As the taxicab drove north on 29th Street, three males crossed the street from a white Ford Mustang automobile which was parked in front of a grocery store, and one of the males pointed a pistol to the victim's face and said, "Give it up." The victim stated that he raised his hands and the defendant took two twenty dollar bills and removed his wrist watch. The two men then fled in the white Ford Mustang and drove off at a high speed. The victim positively identified the defendant as the individual who went into his pockets and who took his watch from his arm. He stated that he was face-to-face with the three men who robbed him and he described the defendant as having an "Afro-bush" haircut and was wearing black gloves and an Army-type jacket.

Almost immediately after the robbery, a police car came along and he hailed the car and told the police officer that he had been robbed and described the white Ford Mustang. He stated that he stood on the corner and waited and within minutes the officer returned with the defendant whom he promptly identified.

The police officer testified that he was hailed by the victim and that he pointed out a white Ford Mustang headed east on Jefferson Street. The officer immediately gave pursuit and at 28th and Jefferson Streets, the Mustang stopped and two males ran from the automobile. One ran north and the other south. The officer turned south and at the intersection of 28th and Master Streets, he observed the defendant standing on the corner. This was only a few minutes after he had been informed of the robbery. The officer took him in the car and returned to the place where the victim was waiting and the victim identified him as

the man who robbed him. The Mustang was later found abandoned.

The issue before us is whether the on-the-scene identification of the appellant as well as the money found in his pocket should have been suppressed as the fruits of an illegal search made pursuant to an illegal arrest.

In regard to the return of the defendant to the scene of the robbery immediately after the arrest, the law is clear that a prompt confrontation by the victim with the accused for the purposes of identification is not inherently a denial of due process of law. *Wise v. U.S.,* 383 F. 2d 206 (D.C. Cir. 1967); *Stovall v. Denno,* 388 U.S. 293, 87 S. Ct. 1967, 18 L.Ed. 2d 1199 (1967). Probable cause exists if the facts and circumstances which are within the knowledge of the officer at the time of the arrest and with which he had reasonably trustworthy information are sufficient to warrant a man of reasonable caution to believe that the suspect committed a crime.

In this case, there were clearly sufficient facts and circumstances existing within the knowledge of the arresting officer to provide the probable cause to justify this arrest without a warrant. The victim had just complained of being robbed and had described the automobile. The officer saw the car, pursued it and saw the appellant leave the car and flee. He followed him and in a very short time saw the appellant standing on a corner near a bus stop. The appellant said he just got off a bus but there was no sign of a bus either coming or going in the vicinity. Under these circumstances, the officer did have probable cause to arrest the appellant as a suspect and take him to the victim for final identification.

Considering the short amount of time involved in this incident from the initial pursuit to the time of apprehension to hold otherwise would seriously ham-

string the police in the apprehension and questioning of suspects.

Judgment of sentence affirmed.

———

DISSENTING OPINION BY SPAETH, J.:

This appeal from a judgment of sentences of 1½ to 8 years for aggravated robbery raises two issues.

The first issue is whether appellant effectively waived his right to trial by jury. Appellant contends that the following colloquy shows that he did not: Q. You are waiving your right to a jury trial voluntarily and willingly? A. Yes, sir. Q. Are you satisfied with your representation by Mr. Stanshine [an Assistant Voluntary Defender]? A. Yes, sir. Q. You had a chance to discuss the case thoroughly with him? A. Yes, sir. Q. Are you sure? A. Well, not too much in detail. No, sir. Q. You have some serious charges here and we want to make certain that you are ready to defend yourself through your counsel. Do you think you need more time? We are supposed to try the case today. A. No, sir. No, sir, I don't think I need any more time.

In other circumstances this colloquy might be held inadequate. Here, however, appellant was about to stand trial a second time on the same charges. He had been tried earlier in the year, and had been convicted, but a new trial had been granted. At the first trial appellant had been represented by the same Assistant Voluntary Defender who represented him at the second trial, and who stood by appellant during the colloquy. Also, appellant had waived his right to trial by jury at the first trial, and there is no allegation that that was an ineffective waiver. In these circumstances appellant's contention that his waiver at his second trial was not knowing and intelligent is unacceptable. *Commonwealth ex rel. Henderson v. Maroney,* 448 Pa.

411, 293 A. 2d 64 (1972). Nor was the waiver involuntary. In reminding appellant that "[w]e are supposed to try this case today," the judge did not exert undue influence upon appellant but simply stated a fact of which appellant should have been aware. Moreover, the record indicates that appellant was prepared to go to trial, so that in responding to the judge that he did "[not] need any more time," he was not acting under any sense of compulsion. Thus, during the trial his attorney presented the testimony of two witnesses (appellant's mother and a non-commissioned Marine officer who produced and testified about appellant's pay records) neither of whom had been called at the first trial.

The second issue is whether appellant was arrested without probable cause, so that the fruits of the arrest —an on-the-scene identification and money found in appellant's pockets—should have been suppressed.

Appellant's motion to suppress was heard by The Honorable WILLIAM J. MCLAUGHLIN, 3rd, immediately before appellant's first trial. When the motion was denied, the Commonwealth's evidence on the motion was by stipulation considered part of the Commonwealth's case in chief. In ordering a new trial, Judge MCLAUGHLIN filed no opinion., so that the basis of his order cannot be determined. When the case was called for the second trial, before The Honorable HERBERT R. CAIN, JR., the motion to suppress was not renewed. Evidently both Judge CAIN and counsel assumed that Judge MCLAUGHLIN's order denying the motion to suppress had not been disturbed by the order granting a new trial and remained the law of the case. In any event, the case has been so argued to us and should therefore be decided accordingly.

On the motion to suppress, the only witness was the arresting officer. His testimony may be summarized as follows.

On October 29, 1970, just before 2:00 A.M., the officer was driving his radio patrol car south on 29th Street in Philadelphia. As he reached the intersection of 29th and Jefferson Streets, he was hailed to a stop by one George Cooper, who said that "[t]hree Negro males that had robbed him had just gotten into a white Mustang and were heading east on Jefferson from 29th." Mr. Cooper also said that one of the men was wearing black gloves.* The officer backed his car, turned left, and chased the Mustang. It stopped at 28th and Jefferson and two Negro males got out.** At this point, the officer was about three-quarters of a block away. He saw one of the Negro males run north on 28th Street, and the other run south. When the officer reached the corner of 28th and Jefferson in his car, he looked north on 28th Street, and then south, but saw no one. He turned right and drove south on 28th toward Master. When he got to 28th and Master he saw appellant standing on the northeast corner. He saw no one else. He asked appellant "how long he had been there, and he stated he had just gotten off the bus [from South Philadelphia]." There is a bus stop at that corner for a bus from South Philadelphia. However, the officer saw no bus. "I asked [appellant] to get into my vehicle, which he did. Then I proceeded west on Master Street from 28th. . . . I went up Master Street to 29th. . . . When I arrived at 29th and Jefferson Street, Mr. Cooper came over, looked into the ve-

---

* In fact the record is not entirely clear when Mr. Cooper told the officer about the gloves, but it may be assumed (as most advantageous to the Commonwealth) that it was when he hailed the officer.

** Mr. Cooper testified at the trial that one of the three men (whom Mr. Cooper identified as appellant) fell, or was thrown, from the Mustang as it turned onto Jefferson Street. The officer evidently did not see this—which is not surprising, as he was backing his car preparatory to turning onto Jefferson.

hicle, and said, 'That is him. That is the man that robbed me.' . . . I immediately called for a supervisor and a wagon. . . . [W]hen the wagon came, [appellant] was placed in the wagon. The complainant got into my car and I went back to 29th and Jefferson to where [the Mustang] was. . . . We checked [it] to see if there was anything inside. . . . [There] wasn't. I then took the complainant [to the police station]."

The record does not disclose how long a period elapsed between the time Mr. Cooper hailed the officer and the time the officer returned to the scene with appellant. Apparently, however, it was a very brief period. The officer testified that he was hailed at "1:52 a.m.," that he chased the Mustang at "[a]pproximately 48 miles an hour", and that it was "[a]bout 30 seconds. . . . It couldn't have been more than a minute" after he picked appellant up at 28th and Master until he returned to the scene. He also testified at the trial that he arrived at 28th and Master at "approximately 1:54" and that that was when he saw appellant "standing on the corner."

The officer's testimony at the trial further disclosed: that it was a cool evening (he was wearing his blue cloth coat) ; that he did not frisk appellant until appellant got into the wagon (appellant had no weapon) ; and that appellant was searched in the police station, among the items removed from his pockets being two $20 bills, which were offered in evidence against him.\*

"An arrest may be accomplished by 'any act that

---

\* Mr. Cooper testified at the second trial that one of the three men "put a pistol in my face", and that while he had his hands up, appellant took two $20 bills from his pocket and a watch from his wrist. Appellant in his defense testified that the reason he had two $20 bills when the police searched him was that as a Marine enlisted man he had just received his two weeks pay of $57 that day. In support of this claim, he called a Marine sergeant, who

indicates an intention to take [a person] into custody and that subjects him to the actual control and will of the person making the arrest:' 5 Am. Jur. 2d, Arrest, §1, p. 695." *Commonwealth v. Bosurgi,* 411 Pa. 56, 68, 190 A. 2d 304, 311 (1963). It is therefore clear that when appellant got into the patrol car, as instructed by the officer, he was under arrest.

An arrest without a warrant is justified if based on probable cause, *i.e.,* if at the inception of the seizure the arresting officer has knowledge of sufficient facts and circumstances, gained through trustworthy information, to warrant a prudent man in the belief that the person seized has committed a felony. *Commonwealth v. Hicks,* 434 Pa. 153, 253 A. 2d 276 (1969).

In *Commonwealth v. Sharpe,* 449 Pa. 35, 296 A. 2d 519 (1972), the court in finding probable cause for an arrest stated the case as follows: "The police arrived at the Robinson home at approximately 10:55 a.m. The victim, though mortally wounded, was conscious and described her assailant as a Negro male, approximately forty years old, 5'9" tall, wearing a dark coat and perhaps a dark hat. . . . [The officers] left the house to cruise the area. As they turned a corner one block from the victim's home, they noticed a man walking about four blocks away. The officers testified there were no other pedestrians about. As they approached, the officers noticed the man was wearing a brown coat and a grayish hat and carrying a blue overnight bag. The appellant had turned up a walkway leading to a dwelling house when the officers parked their patrol car and [one of them] called to the appellant to come down the steps. The officers left their vehicle and met appel-

testified that appellant's personnel records disclosed that he had been paid $57 that day; the sergeant also said the payment was made in the form of "two twenties, a ten, a five, two ones." Appellant did not have Mr. Cooper's wrist watch, which apparently was not recovered.

lant halfway down the steps, at which time they noticed he was perspiring heavily and had what the officers thought was a spot of blood on his face. The officers frisked the appellant and found nothing; they then made inquiry as to the contents of the bag. When the appellant did not answer, one of the officers requested the bag, to which appellant replied, 'I won't give you the bag. I'll show you what's in the bag.' At this point the officers grabbed the bag, a scuffle ensued, the appellant was restrained and visible in the partially unzipped bag was the handle of a revolver." *Id.* at 41, 296 A. 2d at 522-523.

A comparison of these facts with those of the present case is instructive. Here the officers knew nothing about the age, height, build, hair, facial characteristics, or clothing of the robbers—only that there were three of them, that they were black, and that one was wearing gloves. He did not see three men but two. Apparently he thought that appellant was the man who jumped from the Mustang and ran south on 28th Street, yet when he was asked at trial if appellant was "out of breath" when he came upon him, he replied, "No, he wasn't", nor was appellant's clothing disheveled or otherwise in such a condition as to indicate that he had just jumped from a car and had been running.* The officer said that as he drove south towards 28th and Master, he "check[ed] . . . in between vehicles to see if there was a hidden person. . . ." So far as appears, appellant made no attempt to hide or run as the officer approached. As for appellant's statement that he

---

* It will be recalled that Mr. Cooper believed that appellant fell out of the Mustang as it turned the corner. This suggests that appellant was not one of the men the officer saw jump from the car. Also, it should be noted that when the officer was asked, "Did you notice any tears, either on his gloves, or jacket, or any other part of his clothing that might indicate a fall?", he replied, "No, I didn't."

had gotten off a bus, although the officer did not see any bus, he agreed that he "couldn't say how long [appellant] had been standing [on the corner of 28th and Master]," nor "whether a bus had previously passed by." In any case, he did not ask appellant how it was that he had gotten off at that particular corner, nor did he otherwise inquire about appellant's presence in the area.*

Such a record does not warrant a finding of probable cause to arrest. In *Commonwealth v. Pegram,* 450 Pa. 590, 301 A. 2d 695 (1973), it was held that there was no probable cause for the arrest of a man who ran off just as police officers arrived to investigate a robbery reported to be in progress. If flight will not suffice to supply probable cause, then mere presence in the vicinity of a crime shortly after its commission cannot, even if appellant was the only person the officer saw. In *Commonwealth v. Berrios,* 437 Pa. 338, 263 A. 2d 342 (1970), the police officers had almost as little to go on as the officer in the present case. There two officers received a radio report that three males, two Negroes in dark clothing and a Puerto Rican in light clothing, had been involved in a shooting. About twenty minutes later they spotted a Negro in dark clothing and a Puerto Rican in light clothing walking together in a normal manner near the scene of the shooting. "The policemen had no information of the physical make-up or characteristics of the men they were seeking, and hence, did not know if Berrios and his companion were of the same description. If

---

* At the trial appellant testified that he had been visiting his estranged wife and was on his way to his mother's house, where he was staying while on military leave. The Marine sergeant who testified about appellant's pay confirmed that appellant was on leave. Appellant's mother testified that she lived at 1330 North 28th Street, "[a]bout a quarter of a block" from 28th and Master, and that appellant was living with her during his leave.

the policemen were constitutionally justified in searching Berrios under these circumstances, then every Puerto Rican wearing light clothing and walking with a Negro in this area could likewise be validly searched." *Id.* at 342, 263 A. 2d at 344. Similarly, if appellant's arrest was legal, any black man found in the vicinity that night and wearing black gloves could have been arrested.*

It follows that appellant's motion to suppress the two $20 bills and the on-the-scene identification should have been granted. Each was a fruit of the illegal ar-

---

* The officer who arrested appellant had an alternative course of action open to him: "In Terry [v. Ohio, 392 U.S. 1 (1968),] [the Supreme] Court recognized that 'a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.' *Id.*, at 22. The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response. See *id.*, at 23. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." Adams v. Williams, 407 U.S. 143, 145-146 (1972). The Commonwealth contends in its brief that "an arrest for an on-the-scene identification is less of an invasion of a suspect's liberty than taking him directly to a police station because if the identification is negative, the suspect will be released immediately." The brief continues: "Therefore, the degree of probable cause need not be as high in the instance of arrest for immediate identification." This proposition ignores the "intermediate response" contemplated by *Terry*. The police may not on the basis of only the flimsiest information cart someone about on the pretense that the victim of the crime will free him if he is not the culprit. See Davis v. Mississippi, 394 U.S. 721, 726 (1969) (rejecting the State's contention that "detention for the sole purpose of obtaining fingerprints does not require probable cause").

rest.* The case should therefore be remanded for a new trial. This is not to say that at that trial Mr. Cooper may not testify that he recognizes appellant as one of the men who robbed him. Whether such testimony would be proper or precluded under the reasoning of *United States v. Wade*, 388 U.S. 218 (1967), and *Commonwealth v. Futch*, 447 Pa. 389, 290 A. 2d 417 (1972), should be decided by the court below.

HOFFMAN, J., joins in this dissenting opinion.

---

\* *Commonwealth v. Garvin*, 448 Pa. 258, 293 A. 2d 33 (1972), is not to the contrary. There it was held that an identification was not the fruit of an illegal arrest. Although the defendant had been at large for about three weeks, the court reasoned that it could not be assumed "that but for the illegal arrest [he] would have remained at large indefinitely." *Id.* at 266, 293 A. 2d at 38. Thus, "the only effect of the illegal arrest was to hasten the inevitable confrontation [between the defendant and the two women he had robbed]," *id.* at 264, 293 A. 2d at 37, and the identification evidence could not be said to have derived from the exploitation of any illegality. *Id.* at 265, 293 A. 2d at 37. Unfortunately, the court does not refer to the facts that supported its conclusion that the defendant would have ultimately been caught. However, the police did have a full description of the defendant and were able to arrest him from the tip of an informer. In the present case there is no comparable indication that appellant would have ultimately been caught. In fact, it does not appear that the two other men involved in the robbery have ever been caught. As has been discussed, the evidence on which appellant was arrested was very slim. With more time, Mr. Cooper might have been able to give a fuller description of his assailants. At trial he added only somewhat to the description: the man who took his money and watch was "wearing a bush, Afro-bush" and an Army jacket. As the record stands, however, there is no reason to suppose that appellant would have ever been charged if he had not been illegally arrested shortly after the crime occurred. Thus there is no alternative but to conclude that Mr. Cooper's on-the-scene identification was derived from the exploitation of the illegal arrest.