Commonwealth, Appellant, *v.* Nicholson.

Submitted June 9, 1975. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Carolyn Engel Temin* and *Steven H. Goldblatt,* Assistant District Attorneys, *Abraham J. Gafni,* Deputy District Attorney, and *F. Emmett Fitzpatrick,* District Attorney, for Commonwealth, appellant.

*Elaine DeMasse* and *John W. Packel,* Assistant Defenders, and *Benjamin Lerner,* Defender, for appellee.

OPINION BY PRICE, J., March 29, 1976: .

This Commonwealth appeal concerns the validity of an order suppressing the testimony of a co-defendant. We have carefully reviewed the record and must conclude that the testimony was properly suppressed.

Appellee was charged with assault and battery, aggravated assault and battery, assault with intent to kill, aggravated robbery, and robbery. The facts indicate that on February 14, 1973, Mrs. Cheryl Murphy was brutally assaulted by two men in a parking lot outside of a food market in Philadelphia. Mrs. Murphy was robbed and stabbed twice, one of the stab wounds penetrating her heart. This vicious attack was witnessed by Charles Parrish and Cynthia McShane, who came to the aid of Mrs. Murphy and took her to a hospital.

Although Mrs. Murphy was unable to identify either of her assailants, both Mr. Parrish and Miss McShane gave descriptions of the attackers. Both were described as black, of medium build, fifteen to eighteen years old,

five feet nine inches and five feet six inches tall. One was wearing a green army field jacket and the other was wearing a brown car coat and a red cap. Neither witness was able to give a description of the facial features of the assailants, but both agreed that neither wore glasses and that one of them had a mustache.

Later that night following the attack, Officer Raymond Lackey of the Philadelphia Police Department made a "head stop" of appellee and co-defendant James Honesty because appellee was wearing clothing which fit the description of that worn by one of the attackers. However, there was no arrest made at this time because appellee and Honesty did not fit the descriptions given by the eyewitnesses and also because they satisfactorily answered the officer's questions. This stop was recorded on a "75-48" form which was supposed to be submitted to the detective in charge of the case.

A short time after the head stop, appellee was formally arrested. There is no question that this arrest was illegal as not being supported by probable cause. Appellee was questioned and he denied any knowledge of the incident. In addition, the eyewitnesses stated that appellee was *not* one of those involved in the stabbing. Appellee informed the police that he had been with James Honesty for most of the day in question.

The police, however, acting on the information obtained from appellee, secured a picture of James Honesty, and Mr. Parrish identified him as being one of those involved in the attack. After Honesty was questioned, he implicated appellee.

All statements made by appellee at the time of his arrest were later suppressed as the product of the illegal arrest. At trial, however, the Commonwealth attempted to utilize the testimony of Honesty, who had agreed to testify in exchange for a lighter sentence, and of a police officer who had interrogated Honesty. Appellee objected and the trial judge sustained the objection, holding that this testimony was a direct result of the illegal arrest

and as such was the "fruit of the poisonous tree."

Following the sustaining of appellee's objection, the Commonwealth petitioned this court for a Writ of Prohibition against the trial court. Argument was held before Judges HOFFMAN and SPAETH, and the petition was denied. The Commonwealth then petitioned the Supreme Court for the same relief. An agreement was arrived at whereby the trial court's ruling would be treated as a suppression order and a mistrial would be declared. The Commonwealth would then be permitted to appeal the suppression on its merits. It is that appeal with which we are now concerned.

When dealing with cases which involve "the fruit of the poisonous tree," the proper question concerning admissibility of such evidence is, "'...whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint,' Maguire, Evidence of Guilt, 221 (1959)." *Wong Sun v. United States*, 371 U.S. 471, 488 (1965). The Commonwealth contends that they would have discovered Honesty's identity by means wholly independent of the illegal arrest of appellee, thus removing the taint. The Commonwealth argues that Honesty would have come to the attention of the investigating officers as a result of the "75-48" report filled out by the officer who originally made the head stop of appellee and Honesty, by a general investigation of all persons living in the Whitehall Housing Project (Honesty was a resident of Whitehall), or by the eventual identification of Honesty by Mr. Parrish, one of the eyewitnesses who was familiar with Honesty's family.

Unfortunately, we must conclude that the Commonwealth's contentions are simply too speculative to support the admissibility of the testimony. The "75-48" report was never produced at the hearing and we can only guess at what a general investigation of all persons

living in the Whitehall Housing Project might reveal. In addition, we are not convinced that a general investigation of the Whitehall Housing Project would have been undertaken. Finally, the contention that eyewitness-Parrish would have eventually seen and recognized Honesty when Honesty visited his family is too uncertain. We must remember that the description given by Mr. Parrish did not fit Honesty. Although Mr. Parrish did select Honesty's picture from a group of five, we have no proof that Honesty would have been identified if a confrontation had occurred on the street absent the picture identification. We cannot even be reasonably certain that the confrontation would have occurred.

The Commonwealth argues that this case is governed by the decision in *Commonwealth v. Garvin*, 448 Pa. 258, 293 A.2d 33 (1972). In *Garvin*, police received a telephone tip on the whereabouts of one of two participants of a robbery of a beauty salon. Acting on this tip, the police arrested Garvin who was positively identified by the victims. The initial arrest was declared illegal and Garvin moved to have the identification suppressed as the result of the illegal action. The Supreme Court refused to grant the suppression, holding that the only effect of the illegal arrest was to hasten the inevitable confrontation. The court emphasized that the victims had ample opportunity to observe Garvin at close range and under excellent conditions and there was never any doubt as to identification. The actual identification was not influenced by the illegal arrest, but only made possible by confronting the robber with the victim. "[I]t is clear that the illegality contributed neither to the knowledge of the witnesses nor to the accuracy of their identifications." 448 Pa. at 266, 293 A.2d at 38.

The present case may easily be distinguished from *Garvin*, *supra*, on the factual situation alone. The question is not the identification of Honesty but rather the identification of appellee. We must remember that

were it not for Honesty's testimony, appellee would not have been arrested because the eyewitnesses had already informed the police that appellee was not involved.

We must, instead, apply the rationale of *Commonwealth v. Whitaker*, 461 Pa. 407, 336 A.2d 603 (1975), a case factually indistinguishable from that presently before us. In *Whitaker*, police investigating a street gang murder took Tony Whitaker into custody for questioning. It was admitted that this was an illegal arrest. Whitaker denied any involvement in the slaying, but told the officers that John Barton had committed the crime. The police, acting on this information, arrested Barton who in turn implicated Whitaker. Whitaker was again arrested and confessed that he was an active participant in the killing. Whitaker later moved to have all statements made by him, as well as all statements made by Barton, suppressed as being the result of an illegal arrest. Our Supreme Court granted the suppression and stated:

"The Commonwealth contends that our decision in Commonwealth v. Garvin, *supra*, indicates a contrary result. It is argued that because the police knew the identity of Barton before appellant's unlawful arrest, it cannot be assumed that, absent appellant's incrimination of Barton, the latter would never have been arrested and so never would have made his confession implicating Whitaker. We cannot agree. In *Garvin*, the defendant was illegally arrested for robbery and taken to the scene of the robbery, where he was identified by one of the victims. The proof revealed that the victim had had an opportunity to observe her assailant for as long as five minutes under good lighting conditions. There was thus clearly a basis for the identification wholly independent of the unconstitutional arrest. We held that the identification evidence was not the product of the unlawful arrest because the arrest had 'contributed neither to the knowledge of the witnesses nor to the accuracy of their identification.' Commonwealth v.

Garvin, 448 Pa. at 266, 293 A.2d at 38. It was in that context, then, that we said that 'the only effect of the illegal arrest was to hasten the inevitable confrontation and not to influence its outcome.... We cannot assume that but for the illegal arrest the appellant would have remained at large indefinitely.' *id.*

"In the case at bar, as noted above, the Commonwealth concedes that the illegal arrest of appellant did contribute substantially to the arrest of Barton. ... It is possible, of course, that sooner or later the police might have amassed sufficient information from a source independent of the appellant upon which to arrest Barton, but the fact remains that, as far as the record shows, the investigation had not focused on Barton, nor was independent evidence implicating Barton available or likely to be so. *See* Commonwealth v. Cephas, 447 Pa. 500, 508, 291 A.2d 106, 109 (1972).

"The police released Whitaker from custody on November 22 because his initial statement, while inculpatory to a degree, did not provide information sufficient to justify charging him with any involvement in the death of Benjamin Simmons. It is obvious, therefore, that it was the Barton confession which provided both the basis for Whitaker's second arrest and the impetus for his full confession. This concatenation of events completes the causal chain." 461 Pa. at 414-415, 336 A.2d at 606-607.

We affirm the order of the lower court suppressing the evidence.

DISSENTING OPINION BY HOFFMAN, J.:

Appellant, the Commonwealth of Pennsylvania, contends that the lower court erred in suppressing the testimony of appellee's accomplice.

On February 14, 1973, appellant and his accomplice, James Honesty, robbed Mrs. Cheryl Murphy in the parking lot of a Penn Fruit store located in Philadelphia.

During the robbery, Mrs. Murphy, eight months pregnant at the time, was stabbed in the left breast and in the area of the lower left rib, one of the wounds penetrating her heart. Two witnesses, Charles Parrish and Cynthia McShane, took Mrs. Murphy to the Frankford Hospital. Mrs. Murphy survived the brutal attack. During the course of the instant proceedings, however, she was unable to identify her assailants.

The two witnesses gave police the following descriptions of the assailants: "One was medium built, 5 ft. nine wearing a green army field jacket and he was black. The other one was about the same height medium built and he had a brown car coat on and a red cap." They estimated that the two men were between fifteen and eighteen years old. Neither witness gave a description of the assailants' facial features other than that neither wore glasses and that one had a mustache.

While waiting at a bus stop at the corner of Oxford and Frankford Avenues in Philadelphia, appellee was arrested approximately two and one-half hours after the incident. Police arrested him because his clothing fit the general description given by the two witnesses. After appellee was transported to the Police Administration Building at 8th and Race Streets, he was confronted by Parrish and McShane, neither of whom identified him.

Prior to his release, police interrogated appellee concerning his activities during the time that Mrs. Murphy was assaulted. Appellee denied any knowledge of the incident but stated that he had been with one James Honesty for most of the day.

Based on the information received from appellee, Detective Porter, a member of the Philadelphia Police Department, found Honesty's picture in police files. He showed a photographic array to Charles Parrish, who identified Honesty as one of the assailants. Police conducted a search of Honesty's home which uncovered a brown jacket similar to one described by the witnesses, a blood-stained knife, and the victim's credit cards.

Honesty was then arrested, and charged with assault and battery with intent to kill, and related charges. Honesty filed a motion to suppress the photographic identification which was denied on July 5, 1974. On July 24, 1974, Honesty pleaded guilty to charges of assault with intent to kill and aggravated robbery, pursuant to a negotiated plea bargain. The District Attorney was to recommend ten years' probation in return for Honesty's testimony at appellee's trial.

Prior to the plea bargain with Honesty, appellee had filed a motion to suppress the "exculpatory" statement which he had made to the police after his arrest on the date of the assault. The lower court suppressed appellee's statement as the product of an illegal arrest and ordered that any physical evidence discovered by the police would also be suppressed. Thus, the case against the appellee rested solely on the testimony of Honesty.

After the jury was selected, the Commonwealth began the presentation of its case on October 9, 1974. During the lunch recess on October 10, defense counsel objected to the Commonwealth's intended use of Honesty's and the arresting officer's testimony. The objection does not appear in the stenographic record, but it is clear that such objection was made from the subsequent proceedings. Because of the complexity of the issue, the court excused the jury and held a hearing to determine the admissibility of Honesty's testimony. The court then ordered the testimony of both witnesses suppressed.

The Commonwealth petitioned the Superior Court for a Writ of Prohibition against the trial court. The petition was denied on October 15, 1974. The Commonwealth then petitioned the Supreme Court for the same relief. After argument before Chief Justice JONES and Justice NIX, the parties agreed that the court's ruling would be treated as an order of suppression and that appellee would consent to a mistrial. Thus, the issue has been preserved for appeal.

The Commonwealth did not appeal the lower court's order which suppressed appellee's statements; thus, for purposes of this analysis, I assume that the Commonwealth concedes the illegality of appellee's arrest. Nor does the Commonwealth contest that the police focused upon Honesty as a primary suspect as a result of the illegal statement taken from appellee. The Commonwealth does contend that despite the illegality of Honesty's arrest, the subsequent identification by one of the eyewitnesses was lawful under the holding of *Commonwealth v. Garvin*, 448 Pa. 258, 293 A.2d 33 (1972). If the Commonwealth is incorrect, however, the case is indistinguishable from *Commonwealth v. Whitaker*, 461 Pa. 407, 336 A.2d 603 (1975), and the order of the lower court would have to be affirmed. Thus, we must first resolve whether the eyewitness's identification of Honesty would have been admissible against Honesty had he come to trial.

In *Commonwealth v. Garvin*, supra, the Court was faced with the following factual situation: "On August 14, 1969, at about 1:30 p.m., Mrs. Ferro, the owner of a beauty salon, was in her shop with her friend, Mrs. Maloney, when the appellant and his accomplice, Thomas Leging, entered and announced their intention of robbing the two ladies.... The Commonwealth's testimony established that the two men were in the presence of the victims for approximately five minutes, the lighting conditions were good and the ladies had ample opportunity to observe both men. Shortly after the men fled the police apprehended Leging, who subsequently entered a plea of guilty in a separate proceeding." 448 Pa. at 261, 293 A.2d at 35. Garvin was arrested three weeks later as a result of a tip from an anonymous informant. After the arrest, Mrs. Ferro identified him as one of the holdup men. Both witnesses identified him at trial.

The Supreme Court held that Garvin's arrest was illegal. Nonetheless, the Court held that the identification

evidence was properly introduced at trial: "No law abiding society could tolerate a presumption that but for the illegal arrest the suspect would never have been required to face his accusors. Thus, we conclude that the only effect of the illegal arrest was to hasten the inevitable confrontation and not to influence its out-come." The Court recognized that the exclusionary rule prevents the use of "evidence derived so immediately from the unauthorized arrest that its relationship to the illegality was readily apparent." 448 Pa. at 264-265, 293 A.2d at 37. However, "[t]he illegal arrest in this instance merely provided the means for the confrontation with Mrs. Ferro more promptly than would otherwise have been the case. The arrest played no part in the identification of Mrs. Maloney who after the incident did not meet Garvin again until the day of the trial. We cannot assume that but for the illegal arrest the appellant would have remained at large indefinitely. In either case, it is clear that the illegality contributed neither to the knowledge of the witnesses nor to the accuracy of their identifications." 448 Pa. at 266, 293 A.2d at 37-38.

I believe that, were Honesty before this Court, he could not object to the use of the identification evidence that led to his arrest. During the hearing before the lower court in the instant case, Charles Parrish testified that he had attained a good look at Honesty at the time of the incident, that Honesty's mother lived two blocks away from Parrish, and that he had seen Honesty several times in the neighborhood since the time of the incident. Further, Honesty testified that he was residing with his mother. Thus, the likelihood that the police would have located Honesty is at least as great as that present in *Garvin*. Just as in *Garvin*, the illegal arrest played no part in the witness's identification of appellee; the only effect was to speed up that identification process. Contrary to the identification process, police illegality can clearly *cause* or coerce an accused to confess. It

cannot be said that an identification, not challenged as suggestive, is *produced* by the illegality, even though the illegality may expedite the witness's opportunity to view the accused. Thus, I believe that the identification of Honesty was legal and would have been admissible in the case against Honesty.

Appellee contends, however, that the lower court's suppression was correct under *Commonwealth v. Whitaker*, supra. In *Whitaker*, three months after the gang killing of one Benjamin Simmons, the police picked up Whitaker for questioning concerning the murder. The arrest was later held to be illegal. During the interview of Whitaker, he made an exculpatory statement that, although he accompanied John Barton on the day of the incident, he was walking on the other side of the street and did not participate in the stabbing. Based on Whitaker's statement, the police arrested Barton who made a full confession, which fully implicated Whitaker. The police reinterviewed Whitaker and he immediately admitted that Barton's statement was true. The lower court suppressed Whitaker's original statement as the product of an illegal arrest; the court found, however, that the statement given on reinterview was admissible because Barton's intervening statement supplied probable cause for the second arrest.

The Supreme Court reversed and held that the second statement was also the product of the original illegality: "...what is of critical importance for con- stitutional purposes is that there exists a real and direct causal connection between appellant's unlawful arrest on November 22 and his ultimate confession on November 27." 461 Pa. at 413, 336 A.2d at 606. The Court was persuaded by the absence of any evidence which could have led the police to Barton apart from the illegal statement: "In the case at bar, as noted above, the Commonwealth concedes that the illegal arrest of appellant did contribute substantially to the arrest of Barton. It is worth repeating that in the almost three

months prior to appellant's arrest and statements on November 22, the police had learned nothing concerning the Simmons murder with the exception of a vague reference to two names; they had no evidence which would link Barton to the crime...." 461 Pa. at 414-415, 336 A.2d at 607. *Whitaker* is not controlling in the instant case. The illegal arrests in *Whitaker* did not merely speed up the confession process; the arrests produced the statements. In the instant case, the illegal arrest of appellee produced Honesty's name. The identification by Parrish, however, was not the product of the illegal arrest, despite the fact that the arrest speeded up the identification process.

It follows that if Parrish's identification of Honesty would have been admissible at Honesty's trial, Honesty could then testify at appellee's trial. Therefore, in my view, the lower court erred in suppressing the Commonwealth's proffered evidence.

The order of the lower court should be reversed and the case remanded for trial.

CERCONE and VAN DER VOORT, JJ., join in this dissenting opinion.