384 A.2d 1243

## COMMONWEALTH of Pennsylvania

v.

## Lawrence RYAN, Appellant.

Superior Court of Pennsylvania.

Submitted Dec. 22, 1976.

Decided April 13, 1978.

John W. Packel, Assistant Public Defender, and Benjamin Lerner, Defender, Philadelphia, for appellant.

Steven H. Goldblatt and Deborah E. Glass, Assistant District Attorneys and F. Emmett Fitzpatrick, District Attorney, Philadelphia, for Commonwealth, appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

JACOBS, President Judge:

This appeal arises from sentences imposed on appellant following jury verdicts finding him guilty of assault and battery, aggravated assault and battery, and two counts of aggravated robbery. Four issues have been preserved for review: lengthy delay in bringing appellant to trial; refusal to suppress identification of appellant; refusal to permit impeachment of a Commonwealth witness by use of prior inconsistent statements; and admission of evidence of appellant's prior criminal activities. For the reasons that follow, we affirm the judgment of the lower court.

## A. SPEEDY TRIAL

On November 27, 1972, appellant and another were arrested for robbery of two gas stations. During the investigation of these charges, evidence was discovered linking the suspects to two prior robberies, on November 23, 1972, and they were charged with those offenses. At a preliminary hearing held December 22, 1972, the prior robberies were severed at appellant's request, and the two defendants were tried for the gas station robberies. The prior trial concluded on May 17, 1973, at which time appellant request-

ed that the remaining charges be held in abeyance pending appointment of counsel for his co-defendant. Counsel was not appointed until March 11, 1975, but on December 13, 1974, appellant moved to dismiss the indictments against him on the basis that his right to a speedy trial had been violated. The court denied this motion on January 31, 1975, and the case was continued at that time, and a suppression hearing held on April 17, 1975. The motion to suppress was denied, and on April 21, 1975, trial was held before the court below and a jury. Appellant was found guilty, post-verdict motions were denied, and sentence was imposed.

Since appellant's arrest antedates Pa.R.Crim.P. 1100, we must evaluate his speedy trial claim within the framework of *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). In *Barker*, adopted by our Supreme Court in *Commonwealth v. Hamilton*, 449 Pa. 297, 297 A.2d 127 (1972), the factors to be balanced in determining whether a particular defendant's right to a speedy trial has been denied were delineated as follows: length of the delay; reason for the delay; defendant's assertion of his right; and prejudice to the defendant.

Length of the delay, if sufficient, is a triggering mechanism requiring inquiry into the other factors comprising the balance. The 29-month period here while not requiring dismissal is sufficient to justify consideration of the remaining factors. *See Commonwealth v. Coffey*, 230 Pa.Super. 49, 331 A.2d 829 (1974) (25-month delay).

The second factor, the reason for the delay, requires close scrutiny. Initially, we note that appellant is responsible for six months of the delay from the time of arrest to the conclusion of the prior trial, as the result of his request that two of the charges be severed. Additionally, in May, 1973, appellant requested that the present charges be held in abeyance pending appointment of new counsel for his co-defendant. Original co-defense counsel did not withdraw until March 11, 1975, at which time new counsel was appointed. While most of this period of delay could arguably be attributable to appellant, we regard it at most as a neutral cause

of delay. *See Barker v. Wingo,* 407 U.S. at 531, 92 S.Ct. 2182. Finally, from the time appellant moved to dismiss the indictments until trial was held, less than four months elapsed. Even if we were to conclude that the Commonwealth is responsible for this last delay, we would not hold the delay unreasonable on this basis alone, particularly in light of the facts that the Commonwealth was prepared to try all four robberies in May, 1973, and there is no evidence that any of the delay was a tactic on the part of the prosecution to prejudice appellant's defense. *See Commonwealth v. Coffey,* 230 Pa.Super. 49, 54, 331 A.2d 829 (1974).

The third part of the balance is the defendant's failure to promptly assert his right to a speedy trial. Appellant here failed to assert his rights for 25 months, and although he made two requests to dismiss the pending indictments against him, we note that he at no time requested that he be brought to trial. This factor weighs heavily against appellant in light of the fact he has some responsibility to assert a speedy trial claim, and the fact that "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Barker v. Wingo,* 407 U.S. at 532, 92 S.Ct. at 2193.

The final factor to be weighed in the balance is the prejudice suffered by the defendant as the result of the delay. Appellant asserts here that the prejudice caused by the delay is twofold, in that he was prevented from presenting witnesses to describe the scene of the arrest because of the lapse of time, and he suffered oppressive pretrial incarceration.

At trial, appellant attempted to present witnesses to describe the scene of the arrest, and the court refused to admit their testimony, holding that any attempt to describe the area as it presently exists is irrelevant if it does not coincide with the description at the time of arrest. This ruling was a correct statement of the law. *See Commonwealth v. DelMarmol,* 206 Pa.Super. 512, 519, 214 A.2d 264 (1965). Furthermore, we are not persuaded that appellant's defense was impaired by the delay in this case, in light of

the fact that the same rule of evidence would apply to any ordinary delay between arrest and trial. In essence, causation between the delay in this case and the alleged impairment of appellant's defense has not been proved.

Appellant raises the additional claim of prejudice in his assertion that he suffered undue and oppressive pretrial incarceration, and irretrievably lost the opportunity for an earlier parole. *Smith v. Hooey*, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969). We agree with the trial court that appellant suffered no undue anxiety or oppression as the result of the delay in this trial, considering the fact that appellant was not to begin his prior sentence for the gas station robberies until he served a prior sentence of four to six years on still another charge. In addition, we regard any possible prejudice suffered by appellant in this respect to be minimal. *See Commonwealth v. Bailey*, 463 Pa. 354, 344 A.2d 869 (1975).

Although there was a relatively lengthy delay in this case, we are persuaded that much of it was either caused by appellant or the result of a neutral cause. Moreover, appellant failed to assert his rights for 25 of the 29-month period, and failed to demonstrate more than minimal prejudice resulting from the delay. Consequently, we hold that appellant was not deprived of his constitutional right to a speedy trial.

## B. SUPPRESSION OF IDENTIFICATION

Appellant next contends that the court below erred in refusing to suppress lineup and preliminary hearing identifications obtained as the result of an illegal arrest. It is important to note here that this motion was originally made in May, 1973 at a suppression hearing held before appellant's prior trial for the gas station robberies, and denied by Judge SHIOMOS. At the suppression hearing held before trial on the present charges, Judge GUARINO refused to allow relitigation of the legality of the arrest. In all fairness to appellant, we deem Judge SHIOMOS' conclusions as to the legality of the arrest incorporated in Judge GUARINO's

findings, and will therefore review the arrest and identifications at this juncture.

At about 4:15 a. m. on November 27, 1972, officer Theodore W. Black of the Philadelphia police was patrolling the 93rd District when he received a series of radio calls informing him that a gas station robbery had just occurred, involving two Negro males driving a brown Cadillac. Further radio information described the robbers,[1] and stated that the pursued vehicle had been wrecked, and the two suspects were being pursued on foot. Officer Black proceeded to the scene of the chase, and near the area observed a Negro male, the appellant, who appeared to fit one of the radio descriptions. Black stopped appellant and asked his name; appellant responded: "Robert Jones." At that time, the officer noticed a large bulge in appellant's pocket, and proceeded to search him. The search revealed a large roll of paper money, whereupon Black checked the name "Robert Jones" over police radio and was directed to bring appellant in for investigation. Appellant was then taken to the area of the wreck in a police wagon, and from there to the scene of the crime. The gas station owner was unable to make an identification, and appellant was thereupon transported to police headquarters. While appellant was being processed, the police received information implicating appellant in two other robberies, and decided to conduct a lineup. At the lineup, appellant was identified by one of the prior robbery victims. Later at a preliminary hearing held on December 22, 1972, both victims of prior robberies identified appellant as the perpetrator. These identifications are presently before us.

■ The initial question for our determination is the legality of the arrest. The description given Officer Black was that one of the robbers had a dark complexion, was about 5'8" tall, and wore a black coat. Although the officer testified that appellant fit this meager description, and was walking quickly, we are not satisfied that these circumstanc-

---

1. Two Negro males, one 5'7", dark, wearing an earring; the other about 5'8", and also dark, and wearing a dark coat. N.T.S.H. p. 125.

es constituted sufficient probable cause. *See, e. g., Commonwealth v. Richards,* 458 Pa. 455, 327 A.2d 63 (1974). Furthermore, the arrest cannot be justified on the grounds that the officer searched appellant in the reasonable belief that he was armed and dangerous. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). When asked whether the bulge he saw appeared to be a weapon, Officer Black responded: "I didn't know what it was." N.T.S.H. p. 138. Further questioning elicited the information that the search was not a limited intrusion undertaken for the purpose of ascertaining the presence of weapons, but, in the officer's words, "I went through the whole motion. I checked him from head to toe." N.T.S.H. p. 138.

 Despite this illegality, we cannot accept appellant's contention that the identification evidence stemmed directly and immediately from the illegal search and was impermissibly tainted by it. The test that we must apply was set forth in *Wong-Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963), where the Court said:

"We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" (Citation omitted.)

In this case, the wreck of the getaway car led to discovery that the stolen Cadillac belonged to one Clarence Carter, and a wallet in the car belonged to one William Kellog. As previously discussed, Kellog identified appellant at the line-up; both Kellog and Carter identified him as the robber at the preliminary hearing. Identification evidence, however, will not be suppressed merely because it has derived from an illegal arrest. *Commonwealth v. Garvin,* 448 Pa. 258, 293 A.2d 33 (1972). As our Supreme Court indicated in *Garvin,* we cannot assume that but for the illegal arrest appellant

would have remained at large indefinitely. "No law abiding society could tolerate a presumption that but for the illegal arrest the suspect would never have been required to face his accusors." *Commonwealth v. Garvin*, 448 Pa. at 264, 293 A.2d at 37. The record clearly indicates in this case that Carter had ample opportunity to observe appellant when he was beaten and robbed, and made a positive, unwavering identification at trial. N.T. Trial, pp. 384–399; 438–499. Kellog, the other victim of a prior robbery, also got a good look at appellant's face up close when he was robbed, and gave a clear and positive description at trial. N.T. Trial, pp. 1269–1284; 1287–1295. After reviewing the record in this light, we are satisfied that the in-court identifications by Carter and Kellog were based on personal observation during their robberies, and not the result of the exploitation of any illegality. The only effect of the arrest in this case was to hasten the inevitable confrontation between appellant and his victims, not to influence its outcome. *Commonwealth v. Garvin*, 448 Pa. at 264, 293 A.2d 33. Trial testimony of the victims positively demonstrates that appellant's arrest contributed neither to their knowledge as witnesses nor to the accuracy of their identifications. Consequently, we hold that the court did not err in refusing to suppress the identification testimony, when the testimony was sufficiently independent of the illegal arrest as to be unaffected by the "fruit of the poisonous tree" prohibition. *Commonwealth v. Crutchley*, 242 Pa.Super. 496, 364 A.2d 381 (1976).

## C. IMPEACHMENT—PRIOR INCONSISTENT STATEMENT

Appellant next contends that the trial court erred in refusing to direct the court stenographer to read prior statements made by a Commonwealth witness under oath, for the purpose of impeaching the witness by prior inconsistent statements.

At the pretrial suppression hearing before Judge GUARINO, Detective West was questioned about the composition of the lineup, and testified as follows:

MS. CHRISTIE: Were you able, when you looked through the glass at the line-up participants, to see any part of the bodies of the participants below their waist—strike that. I should say, Detective when you looked through the glass at the line-up participants, were you able to see any portions of the body of these participants which were below the level of the table?

DETECTIVE WEST: Little if at all . . ." N.T.S.H. pp. 157–158.

And further,

MS. CHRISTIE: Did you have occasion to note any of the participants in the lineup at the time you looked through the screen which you've indicated was contemporaneously with the complainant, with their legs faced—the sides of their legs facing the screen?

DETECTIVE WEST: Not to my knowledge, no.

MS. CHRISTIE: As a matter of fact, did you have occasion to note at all in what direction the front of the legs of the police officer participants were facing?

DETECTIVE WEST: No I wouldn't—would have no reason to.

MS. CHRISTIE: As a matter of fact, did you have occasion to note at all whether or not you could see any stripes on the police officer's trousers?

DETECTIVE WEST: I wasn't even looking at his legs, at anybody's." N.T.S.H. pp. 161–162.

At trial, Detective West was again asked what portion of the participants in the lineup he could see below the table. He answered: "None." N.T. Trial, p. 1239.

 We discern no inconsistency between these statements, and therefore hold that the trial judge committed no error in refusing to allow the attempted impeachment. Detective West's testimony was substantially the same on both occasions, thereby precluding impeachment by use of a prior inconsistent statement. A mere dissimilarity between the prior statement and the present testimony will not suffice; there must be a substantial inconsistency. *See In re Silverberg*, 459 Pa. 107, 117, 327 A.2d 106 (1974).

## D. RADIO CALLS—PRIOR CRIMINAL ACTIVITY

 Appellant's final assignment of error contains the claim that the Commonwealth improperly presented evidence of appellant's prior criminal activities, by repeated reference to radio calls broadcast to the police during pursuit of appellant. The problem arises from the fact that while appellant was being tried in this case for the November 23 robberies, the radio calls at issue were the result of 2 robberies that occurred on November 27. We are compelled to agree with the trial judge, however, that references in the record to these radio calls in no way implied prior criminal activity by appellant, and consequently did not prejudice him before the jury.[2]

Moreover, we are persuaded that testimony as to the radio broadcasts was not offered or admitted to prove the truth of the broadcasts, but rather to show the mental state of the police and explain their course of *conduct.* Under these circumstances, we find no error. *See Commonwealth v. Sampson*, 454 Pa. 215, 219, 311 A.2d 624 (1973); *Commonwealth v. Jacobs*, 445 Pa. 364, 367, 284 A.2d 717 (1971); *Commonwealth v. Tselepis*, 198 Pa.Super. 449, 452, 181 A.2d 710 (1962).

Accordingly, the judgment of sentence is affirmed.

CERCONE, J., concurs in the result.

HOFFMAN, J., files a dissenting opinion in which SPAETH, J., joins.

SPAETH, J., files a dissenting opinion in which HOFFMAN, J., joins.

WATKINS, former President Judge, did not participate in the consideration or decision of this case.

**2.** The trial court noted one reference to prior criminal activity when Officer Cheatham inadvertently referred to a holdup at Vare Avenue, the scene of the gas station robberies. We nevertheless agree with the trial judge's characterization of this testimony as a spontaneous slip, and no basis for a new trial. *Commonwealth v. Bunch*, 454 Pa. 365, 311 A.2d 632 (1973). Furthermore, defense counsel declined the trial judge's offer of a curative instruction. Lower Court Opinion at 15.

HOFFMAN, Judge, dissenting:

I join in Judge SPAETH's cogent dissenting opinion. I also believe that appellant has another meritorious claim: the lower court erred in refusing to suppress line-up and preliminary hearing identifications obtained as a result of appellant's illegal arrest. Accordingly, I dissent.

I agree with the Majority that the Philadelphia police did not have probable cause to arrest appellant. However, I do not agree with the Majority's conclusion that the identification evidence was not a fruit of the illegal arrest. The Majority believes that *Commonwealth v. Garvin,* 448 Pa. 258, 293 A.2d 33 (1972) allows the introduction of identification evidence obtained after an illegal arrest in all cases in which a victim had an ample opportunity to observe the assailant at the time of the commission of the crime and was able to make a positive, unwavering identification. I submit that the Majority reads *Garvin* too broadly, that subsequent cases have rejected such a broad interpretation of *Garvin,* and that the Majority's analysis would license the police to utilize intolerable dragnet arrests.

My analysis commences with a close examination of *Commonwealth v. Garvin.* In *Garvin,* appellant and an accomplice robbed the owner of a beauty salon and her friend. The victims had ample opportunity to observe the two assailants. Shortly after the commission of the crime, the police apprehended the accomplice; the accomplice subsequently pleaded guilty. Three weeks after the robbery, an informant telephoned the police and asserted that an eyewitness had linked Garvin to the robbery. The police arrested Garvin and transported him to the beauty salon where the owner identified him as her accoster. At trial, both the owner and her friend positively identified Garvin and the court admitted the pre-trial identification; a conviction ensued. On appeal, our Supreme Court concluded that the police did not have probable cause to arrest Garvin. Nevertheless, the Court held that the pre-trial and in-court identifications were not fruits of the illegal arrest and were, therefore, properly admitted. In particular, the Court stat-

ed: "No law abiding society could tolerate a presumption that but for the illegal arrest the suspect would never have been required to face his accusors. Thus, we conclude that the only effect of the illegal arrest was to hasten the inevitable confrontation and not to influence its outcome." supra 448 Pa. at 264, 293 A.2d at 37. Further, the Court reasoned that "[t]he illegal arrest . . . merely provided the means for the confrontation with [the owner] more promptly than would otherwise have been the case. The arrest played no part in the identification of [the owner's friend] who after the incident did not meet Garvin again until the day of the trial. We cannot assume that but for the illegal arrest the appellant would have remained at large indefinitely.[1] In either case, it is clear that the illegality contributed neither to the knowledge of the witnesses nor to the accuracy of their identifications." supra 448 Pa. at 266, 293 A.2d at 37.

According to the Majority, *Garvin* creates a conclusive presumption that an illegal arrest cannot taint a subsequent pretrial identification based on personal observation during a crime because sooner or later the police would have legally apprehended the defendant. I submit that this reading of *Garvin* is too broad; instead, I believe *Garvin* turns on the Commonwealth's ability to prove that it had a source of information independent of the illegal arrest that could have led to the legal arrest of the defendant.

First, a close reading of the facts involved in *Garvin* reveals that the police in fact would have eventually apprehended the defendant through the use of legal means. The police had already arrested his accomplice who pleaded guilty. Moreover, the police had a full description of Garvin and the aid of an informant who implicated him. Garvin was a suspect. The police could have arranged to have the

1. "Our view on this point was succinctly summarized in *United States v. Hoffman,* 385 F.2d 501 (7th Cir. 1967), when it was stated that 'it would be naive to assume that but for the unlawful arrests the trio would "have blended back into the mass of population, and would have remained at large" as appellants contend' 385 F.2d at 503." (footnote 4 in the original).

beauty salon owner observe Garvin, by photo or in person, before they made a formal arrest. Thus, it can fairly be said that the police had leads independent of the illegal arrest which could ultimately have led to Garvin's prosecution. See *Commonwealth v. Favors,* 227 Pa.Super. 120, 125, 133, 323 A.2d 85, 88, 92 (1974) (Dissenting Opinion by SPAETH, J.).[2]

Second, *Garvin,* premises its doctrine of hastened confrontation, in part, upon *United States v. Hoffman,* 385 F.2d 501 (7th Cir. 1967). *Commonwealth v. Garvin,* supra 448 Pa. at 266 fn. 4, 293 A.2d at 38 fn. 4. In *Hoffman,* the Court held that despite the illegal arrest of Hoffman and her co-defendant, the trial court properly admitted the co-defendant's testimony implicating Hoffman. The Court based its holding upon a finding that the government had information independent of the illegal arrest which would in fact have led to Hoffman's capture. Thus, the Court stated: "While the unlawful arrests did serve to result in a disclosure of the true identities of Fears, Johnson and Hoffman, all of whom had registered at the motel under other names, the existence of these persons, their association together, and the fact that some stolen money orders had been left behind in the motel room occupied by one of them, were facts which became known apart from any disclosure resulting from the arrests and unlawful search and seizure. These facts supplied an adequate basis for the investigation which followed and culminated in the filing of the informations. In our opinion it would be naive to assume that but for the unlawful arrests the trio would 'have blended back into the mass of the population, and would have remained at large' as appellants contend.[3] Certainly, the unlawful arrests did not serve to immunize the appellants from prosecution." Supra at

2. The Majority in *Commonwealth v. Favors* did not discuss *Garvin* because it concluded that the arrest was made on the basis of probable cause.

3. "At the time of the arrests an F.B.I. investigation had begun of a series of incidents involving the passing of stolen money orders at LaCrosse, Onalaska, and Superior, Wisconsin." (footnote 2 in the original).

503–04.[4] In sum, the facts in *Garvin* and the Supreme Court's reliance on *United States v. Hoffman* demonstrate that *Garvin* is predicated upon the factual, rather than the assumed, inevitability of the defendant's arrest.

Subsequent cases have rejected the sweeping interpretation of *Garvin* which the Majority endorses today. For example, in *Commonwealth v. Richards,* 458 Pa. 455, 327 A.2d 63 (1974), our Supreme Court awarded a new trial because an illegal arrest tainted a confession. The Court in dictum discussed appellant's contention that the illegal arrest also tainted a pre-trial identification. In a footnote, the Court noted that such a contention was contrary to *Commonwealth v. Garvin.* Nevertheless, in the text of its opinion, the Court stated that it would not decide whether the admission of pre-trial identification evidence was "harmless error" and also cautioned the lower court to exclude reference to this testimony during the retrial.

*Commonwealth v. Brown,* 470 Pa. 274, 368 A.2d 626 (1976) also evidences our Supreme Court's reluctance to interpret *Garvin* broadly.[5] In *Brown,* the Court held that an illegally obtained confession had not poisoned the subsequent discovery of a murder weapon and a witness who inculpated the defendant. The Court articulated the following guidelines for determining when the exclusionary rule mandates suppression of evidence allegedly tainted by a constitutional violation: "Where the initial taint did not effect the reliability of the evidence, the only basis for excluding relevant testimony is to discourage unlawful police practices by preventing the exploitation by police of their improper acts. However, where the prosecution can establish that the challenged evidence would have come to its attention from an independent source free of the taint, there is not the type of exploitation of the illegality that requires the imposition of

4. In the absence of any facts indicating an independent source of information as in *United States v. Hoffman,* supra, it would be naive to assume that a criminal would not blend back into the mass of the population. This is especially so when the crime occurs in a city the size of Philadelphia, as in the instant case.

5. Justice NIX, the author of *Garvin,* wrote *Brown.*

the rule of exclusion. Restated, where the evidence obtained as the result of illegal police activity would have been discovered in the course of a lawfully conducted investigation, no purpose is served in applying the exclusionary rule. *Lockridge v. Superior Court,* 3 Cal.3d 166, 170, 89 Cal.Rptr. 731, 474 P.2d 683 (1970)." supra 470 Pa. at 284, 368 A.2d at 631. The Court then concluded that the Commonwealth had met its burden of demonstrating an independent source which in fact would have led to the discovery of the allegedly tainted evidence. The Court discussed *Garvin* : " . . . [There,] *we concluded that the evidence secured through the illegality should nevertheless have been admitted where it was obvious that without the illegality the Commonwealth would have obtained the information."* supra 470 Pa. at 283, 368 A.2d at 631. (Emphasis supplied). Thus *Brown* restricts *Garvin* to situations in which the Commonwealth factually establishes the existence of an independent source which would have inevitably led to the defendant's arrest.

Our Court has also subscribed to a narrow reading of *Garvin.* In *Commonwealth v. Nicholson,* 239 Pa.Super. 175, 361 A.2d 724 (1976), we held that the lower court properly suppressed a co-defendant's testimony which had been obtained as the result of the defendant's illegal arrest. In particular, we rejected the Commonwealth's contention that an eyewitness to the crime would have eventually seen, recognized, and reported the co-defendant who implicated Nicholson. Our Court stated: *"Finally, the contention that eyewitness-Parrish would have eventually seen and recognized Honesty when Honesty visited his family is too uncertain.* We must remember that the description given by Mr. Parrish did not fit Honesty. Although Mr. Parrish did select Honesty's picture from a group of five, we have no proof that Honesty would have been identified if a confrontation had occurred on the street absent the picture identification. *We cannot even be reasonably certain that the confrontation would have occurred."* supra 239 Pa.Super. at 179, 361 A.2d at 726 (Emphasis supplied). Because the Commonwealth did not establish the factual certainty of the co-defendant's

ultimate apprehension through a source independent of the constitutional violation, we rejected the Commonwealth's reliance on *Garvin*.[6] If we required the Commonwealth in *Nicholson* to demonstrate an independent source leading to the co-defendant's eventual arrest, then we must require the Commonwealth in the instant case to demonstrate an independent source which could have resulted in appellant's ultimate apprehension.

Finally, and most importantly, I believe that the Majority's overly broad interpretation of *Garvin* would immunize from judicial protection impermissible and wholesale intrusions on the constitutional rights of our citizenry. *See U.S.Const.*, amend. IV; *Pa.Const.* Art. I, § 8. *Commonwealth v. Brown*, supra, instructs us to assess the alleged taint emanating from an illegal arrest in light of the policies which underlie the exclusionary rule: "Restated, where the evidence obtained as a result of illegal police activity would have been discovered in the course of a lawfully conducted investigation, no purpose is served in applying the exclusionary rule." supra 470 Pa. at 284, 368 A.2d at 631. The Majority's analysis subverts the privacy interests protected by the exclusionary rule and encourages unlawful police practices by permitting the police to reap the benefit of illegal acts. Extended to its logical conclusion, the Majority's reading of *Garvin* would authorize dragnet arrests without probable cause and the subsequent parading of innocent individuals before the victim. The Majority refuses to impose the only sanction, exclusion of the identification testimony, which could effectively deter such blatantly illegal police procedures.

6. I filed a Dissenting Opinion in *Nicholson* in which I argued that the co-defendant's testimony should not have been suppressed. I noted my belief that the Commonwealth had established as much likelihood of the co-defendant's eventual arrest as the Commonwealth established in *Garvin*. For example, the eyewitness testified that he had a good opportunity to observe the co-defendant and that he had seen the co-defendant several times in the neighborhood since the time of the incident. In fact, the co-defendant resided in his mother's home only two blocks from the scene of the crime.

In conclusion, I would interpret *Garvin* and its progeny as requiring the Commonwealth to establish a source of information independent of the illegal arrest which could have led eventually to a defendant's legal arrest and subsequent identification. I would hold that the presumption of inevitable apprehension relied upon by the Majority cannot serve as a substitute for this independent source. If the Commonwealth fails to demonstrate such an independent source, the identification has not been purged of its primary illegality. In the instant case, the record does not reveal any evidence supporting the existence of an independent source of information which could have resulted ultimately in appellant's arrest.[7] Accordingly, the lower court should have suppressed the identification testimony.

SPAETH, J., joins in this dissenting opinion.

SPAETH, Judge, dissenting:

I think appellant was denied a speedy trial.

1

Appellant's request for severance did not preclude the Commonwealth from listing this case for trial shortly after the conclusion of the trial of the other case in May, 1973. Instead the Commonwealth did nothing for almost two years, finally listing this case for trial in March, 1975.

The majority says: "While most of this period of delay [the almost two years] could arguably be attributable to appellant, we regard it at most as a neutral cause of delay." at 96–97. "[N]eutral" causes of delay are not "neutral" in the sense of weighing neither against the government nor against the defendant; they weigh against the government. Thus in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Court said:

Closely related to length of delay is the reason the government assigns to justify the delay. Here, too, dif-

---

7. While the police did search the stolen getaway car which had been wrecked during the chase, the police found no evidence connecting appellant to the crime which ultimately would have led to his arrest.

ferent weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighed heavily against the government. [Footnote omitted.] A more neutral reason such as negligence or overcrowded courts should be weighed less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. *Id.* at 531, 92 S.Ct. at 2192.

Neither do I agree that "most of . . . [the] delay could arguably be attributable to appellant." Either appellant's request that new counsel be appointed for the co-defendant was warranted or unwarranted. The majority does not suggest that the request was unwarranted. Given a warranted request, it was the government's responsibility to see to it that it was granted, and granted reasonably promptly. I do not understand what support the majority finds in the fact that "[o]riginal co-defense counsel did not withdraw until March 11, 1975." at 96. Why, then, did not the Commonwealth proceed to trial at once, shortly after the first trial in May, 1973? If the answer is that the Commonwealth did not think original co-defense counsel belonged on the case, why, then, was not new counsel appointed, as appellant had requested? However these questions are answered, the conclusion is that the delay, whether characterized as "neutral" or not, was attributable only to the Commonwealth, and must be weighed against it.

2

The majority says that appellant was not prejudiced by the delay. at 97. I can only say that the majority's own statement of the case leads me to the opposite conclusion. As the majority acknowledges, "appellant attempted to present witnesses to describe the scene of the arrest, and the court refused to admit their testimony, holding that any attempt to describe the area as it presently exists is irrelevant if it does not coincide with the description at the time of arrest." *Id.* Precisely: Because of the delay, appellant was precluded from presenting witnesses.

In *Barker v. Wingo, supra,* the Court considered just this situation. After identifying the various ways a defendant might be prejudiced by having to wait for his trial, the Court said that the "most serious" was "the possibility that the defense will be impaired." *Id.* at 532, 92 S.Ct. at 2193. The Court continued:

[T]he inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown. *Id.*

The majority says, however, that it is "not persuaded" that appellant's witnesses would have been allowed to testify had there been only an "ordinary delay between arrest and trial." at 97–98. Why the majority is not persuaded, it does not say. In most cases where there has only been ordinary delay witnesses are allowed to testify; it is only in cases of extended delay, such as this one, where they may not be.

3

Finally, the majority says that "[a]ppellant here failed to assert his rights for 25 months . . . ." at 97. I submit, this is not an accurate statement.

I assume the majority computes the 25 months by counting from November 27, 1972, when appellant was arrested, to December 13, 1974, when he moved to dismiss the indictments on the ground of denial of speedy trial. The trial on the first of the two severed cases was held in May, 1973. It cannot be maintained that during the 5 or 6 months from December, 1972, to May, 1973, appellant "failed to assert" his right to a speedy trial; he was *getting* a speedy trial. Thus, the majority's 25 months must be reduced to 19 or 20 months.

Nor can even this period of 19 or 20 months be all counted against appellant. As has been discussed, it was the Com-

monwealth's obligation to move the case to trial. Consequently, appellant was entitled to assume, for at least some period of time, that the Commonwealth was doing what it was supposed to do. Opinions will differ. For myself, I should be unwilling to hold it against a defendant that he waited 6 months, perhaps even 9, before he wondered when his case would come to trial, and started to press for trial. Thus of the 25 months delay, I should weigh against appellant only about 10 to 12 months. Surely it is not fair to weigh all of it against him as the majority does.

The judgment of sentence should be vacated, and appellant discharged.

HOFFMAN, J., joins in this opinion as well as filing a separate dissenting opinion.