535 A.2d 616

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Daniel STEIN, Appellee.**

Superior Court of Pennsylvania.

Argued Oct. 15, 1987.

Filed Dec. 31, 1987.

410

Frances G. Gerson, Assistant District Attorney, Philadelphia, for Com., appellant.

Robert P. Fulton, Philadelphia, for appellee.

Before McEWEN, MONTEMURO and KELLY, JJ.

MONTEMURO, Judge:

On June 3, 1987, the trial court issued an order against the Commonwealth suppressing the following evidence: an oral statement given by the defendant to the police, a written statement given by the defendant to the police, all physical evidence obtained as a result of a search of the defendant's residence, and all identifications of the defendant. The Commonwealth has appealed.

The relevant factual history is as follows. Early in the morning of June 21, 1984, Daniel Farrell was awakened by a light in his hallway. His bedroom light was then switched on, and he saw two armed men enter his bedroom. At the suppression hearing, Mr. Farrell testified that one of the men had a rifle and the other man, whom Farrell identified as the defendant Daniel Stein, came up to him and put a gun to the side of his face. RR. at 236A. Mr. Farrell testified that he was lying on his back in his bed when the two men entered his bedroom and that as the defendant approached him, the defendant warned Farrell that if Farrell moved he would "blow his brains out." RR. at 237A. Mr. Farrell testified that as the other man went through dresser drawers, the defendant continued to hold the gun to the side of his face and searched the drawers in a cabinet beside his bed. Mr. Farrell further testified as follows:

Q. During this time did you have an opportunity or what opportunities did you have to look at Stein himself?

A. Oh, I seen his face as he was right up to me. If I look eight, a couple times. (sic) He did not want me to look at him.

Q. How did you know he didn't want you to look at him?

A. He told me not to stare at him, look the other way, don't turn.

Q. What did you do?

A. Eventually, he said roll over on your back, face flat down, which I did. After three minutes of laying there looking at him and the other guy.

RR. at 240A.

A detective, John Gallow, interviewed Mr. Farrell shortly after the robbery.[1] At that time, Mr. Farrell supplied the detective with physical descriptions of the two men involved in this incident. RR. at 102A. The detective used this information to generate a police memo which described the men as: one white male, age 28, weight 150 pounds, black hair, blue shirt, approximately 5′9″ tall, green pants and one white male, age 25, height 6′1″, black hair in ponytail, weight 150 pounds, white tee shirt and jeans. RR. at 106A. Approximately four weeks after the robbery, Mr. Farrell contacted detective Gallow and told him that he had learned the names of the two men who had robbed him by paying for information on the street. He said that the names of the men were Danny Stein and Ricky or Eric Rubin. RR. at 110A. During the evening of July 24, 1984, while on his way to do a record search of these two men, detective Gallow heard a radio transmission of a license check of a Daniel Stein, who had been stopped for a traffic violation. The detective then broadcast to the officers who were running this license check that a Daniel Stein was a suspect in a robbery and was suspected of being armed. RR. at 123A. In its Findings of Fact, the trial court concluded that although the police officers testified that, following this

---

1. Mr. Farrell reported to the police that his living room had also been ransacked and that numerous items were missing.

broadcast, they had transported the defendant to the North-east Detective Division because he had no driver's license or vehicle registration, the officers had actually "decided that the defendant would be held in custody at least temporarily as he may be a suspect in a robbery." RR. at 23A (123A).

After researching police records and obtaining a negative of a Daniel Stein who lived in the vicinity where Daniel Farrell had been robbed and who had a history of similar crimes, detective Gallow went to the room where the defendant was being detained. Detective Gallow noticed that the defendant resembled the negative of the Daniel Stein that he had just retrieved from police files. He decided to question the defendant concerning the robbery of Daniel Farrell. RR. at 117A–119A and 126A–128A. At this point, the defendant had already been issued the traffic violations. As a result of detective Gallow's statements and questions to the defendant, the defendant gave an oral and a written statement concerning the robbery and consented to a search of his residence which resulted in the seizing by police of stereo equipment which had been reported by Daniel Farrell as missing from his home. RR. at 149A. The defendant was charged with robbery, theft, simple assault, criminal conspiracy and weapons offenses. Following a suppression hearing, the trial court held that the arrest of the defendant was illegal and on that basis suppressed the statements and the physical evidence. These rulings by the trial court have not been appealed by the Commonwealth. However, the Commonwealth has appealed from the suppression of the preliminary hearing identification of the defendant by the victim, Daniel Farrell, and the suppression of all subsequent identifications.

The record indicates that during the preliminary hearing, Daniel Farrell identified the defendant as the man who had robbed him. RR. at 243A. At the suppression hearing, Farrell testified that when he identified the defendant at this hearing, he had had "no doubt at all" that the defendant was the man who had robbed him. RR. at 247A. Although Mr. Farrell testified that he had discussed the

investigation of this crime with detective Gallow before the date of the preliminary hearing, the parties do not dispute the fact that Mr. Farrell had not been shown a photograph of the defendant by police prior to the preliminary hearing and there had been no pre-trial lineup involving the defendant Daniel Stein. The first time that Mr. Farrell saw the defendant following the night of the robbery was at the preliminary hearing when he was asked by the court to indicate whether he recognized the defendant as one of the men who had been involved in the robbery. RR. at 280A. We must determine whether the trial court erred in suppressing all identifications by the victim Daniel Farrell as the fruit of the poisonous tree, the poisonous tree being the illegal arrest and statements of the defendant-appellee.

Initially, we reject the contention that the Commonwealth has waived this issue. The trial court specifically held in its Conclusions of Law that "any and all identifications of the defendant flow directly and unalterably from his illegal arrest and statement." RR. at 27A. During the suppression hearing, the trial court made it clear that it viewed the preliminary hearing identification of the defendant to be a "direct result" of the illegal arrest and, thus, a fruit of this poisonous tree. RR. at 362A and 371A. During the suppression hearing, the Commonwealth orally objected to the legal conclusions the trial court had reached. RR. at 376A. Further, this issue was included in the Commonwealth's statement of appellate issues which the Commonwealth filed pursuant to Pa.R.A.P. 1925(b):

Did the suppression court err in concluding that the defendant's statement, the physical evidence seized pursuant to a consent search and the *complainant's identification* of defendant were the *direct result* of an illegal arrest and inadmissible?

Our scope of review in suppression matters is limited primarily to questions of law. We are bound by the suppression court's findings of fact, if those findings are supported by the record. It is clear that we are not bound by the suppression court's conclusions of law. *Common-*

*wealth v. White,* 358 Pa.Super. 120–123, 516 A.2d 1211, 1212–1213 (1986).

In reaching our decision in the instant case, we turn once more to the language of the United States Supreme Court in *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963):

> We need not hold that all evidence is the 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by the exploitation of that illegality or by means sufficiently distinguishable to be purged of the primary taint.'

▪ What we must consider in the instant case is whether the identification of the defendant-appellee Stein was obtained by the exploitation of his concededly illegal arrest and statements to the police. In *Commonwealth v. Howe,* 246 Pa.Super. 7, 14, 369 A.2d 783, 786 (1977), we recognized that "the word 'exploitation' is important, for it implies a causal connection between the illegality and the evidence in question."

In *Commonwealth v. Ryan,* 253 Pa.Super. 92, 384 A.2d 1243 (1978), the trial court had refused to suppress the identification testimony of a robbery victim, Carter, who had identified the defendant as the perpetrator of the crime at a preliminary hearing. In *Ryan,* as in the instant case, the victim had not seen the defendant or a photograph of the defendant prior to the preliminary hearing. In *Ryan,* as in the instant case, the arrest of the defendant was illegal because it had been made without a warrant and without probable cause. In *Ryan,* we affirmed the trial court and stated the following:

> Identification evidence, however, will not be suppressed merely because it has derived from an illegal arrest. *Commonwealth v. Garvin,* 448 Pa. 258, 293 A.2d 33 (1972). As our Supreme Court indicated in *Garvin,* we cannot assume that but for the illegal arrest appellant

would have remained at large indefinitely. "No law abiding society could tolerate a presumption that but for the illegal arrest appellant would have never been required to face his accusers." *Commonwealth v. Garvin*, 448 Pa. at 264, 293 A.2d at 37. The record clearly indicates in this case that Carter had ample opportunity to observe appellant when he was beaten and robbed, and made a positive, unwavering identification at trial ... After reviewing the record in this light, we are satisfied that the in-court identifications of Carter and Kellog were based on personal observation during their robberies, and not the result of the exploitation of any illegality. The only effect of the arrest was to hasten the inevitable confrontation between appellant and his victims, not to influence its outcome. *Commonwealth v. Garvin*, 448 Pa. at 265, 293 A.2d 33. Trial testimony of the victims positively demonstrates that appellant's arrest contributed neither to their knowledge as witnesses nor to the accuracy of their identifications. Consequently, we hold that the court did not err in refusing to suppress the identification testimony, when the testimony was sufficiently independent of the illegal arrest as to be unaffected by the "fruit of the poisonous tree" prohibition. *Commonwealth v. Crutchley*, 242 Pa.Super. 496, 364 A.2d 381 (1976).

*Id.*, 253 Pa.Superior Ct. at 100–101, 384 A.2d at 1247, 1248.

Likewise, in the instant case, the identification evidence provided by the victim did not derive from the "exploitation" of any illegal conduct by the police. At the time the victim Farrell observed the two men in his bedroom and at the time he described the physical characteristics of the men to the police, the police had done nothing illegal. In *United States v. Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980), the United States Supreme Court discussed the application of the exclusionary rule to identification evidence. In *Crews*, the victim of an armed robbery identified the defendant in a photographic array, in a lineup, and at trial. The District Court found that the arrest of the

defendant had been effected without probable cause. Accordingly, the court suppressed the photographic and lineup identifications. However, the court concluded that the victims' ability to identify the defendant at trial was based upon independent recollection untainted by the intervening identifications and therefore held such evidence admissible. The District of Columbia Court of Appeals, sitting en banc, reversed the District Court on the grounds that the in-court identification should have been excluded. The Court of Appeals concluded that the unlawful police behavior *did* have a causal relationship to the acquisition of the identification evidence because "but for respondent's unlawful arrest, the police would not have obtained the photograph that led to his subsequent identification by the complaining witnesses and, ultimately, prosecution of the case." *Crews* at 469, 100 S.Ct. at 1249. The Court of Appeals then considered whether the in-court identification could nevertheless be admitted under one of the "commonly advanced exceptions to the exclusionary rule—the 'independent source', 'inevitable discovery', or 'attenuation doctrines'. . . ." *Id.* at 470, 100 S.Ct. at 1249. The court found these exceptions inapplicable.

The Supreme Court reversed the Court of Appeals. The Court was unanimous in its holding that the in-court identification of the defendant by the victim of the crime should not have been suppressed as the fruit of the defendant's unlawful arrest. The Court stated that in the "typical fruit of the poisonous tree case . . . the challenged evidence was acquired by the police *after* some initial Fourth Amendment violation, and the question before the court is whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the 'taint' imposed upon the evidence by the original illegality." *Id.* at 471, 100 S.Ct. at 1250. The Court recognized that cases involving in-court identifications of the accused are not the typical fruit of the poisonous tree cases and that such identifications have the following elements:

First, the victim is present at trial to testify as to what transpired between her and the offender, and to identify the defendant as the culprit. Second, the victim possesses knowledge of and the ability to reconstruct the prior criminal occurrence and to identify the defendant from her observations of him at the time of the crime. And third, the defendant is also physically present in the courtroom, so that the victim can observe him and compare his appearance to that of the offender.

*Id.*

In *Crews*, the Court found that none of the elements of the in-court identification had been derived from the exploitation of the violation of the defendant's Fourth Amendment rights. The Court reasoned that the victim's presence in the courtroom was not the product of any police misconduct because the victim's identity was known to the police long before the defendant was arrested. Just like the victim of the crime in the instant case, the victim in *Crews* had notified the police immediately following the criminal incident and had given a full description of her assailant.[2] Further, the Court in *Crews* found that the victim's ability to give an accurate in-court identification of the defendant was based on her observations at the time of the robbery and was not the result of illegal police conduct committed long *after* she had developed the capacity to identify her assailant. *Id.* at 472–473, 100 S.Ct. at 1250–1251. Like the victim of the robbery in the *Crews* case, the victim of the robbery in the case before us observed his assailants during the crime and "constructed a mental image" of their physical appearances in his mind. *Id.* at 472, 100 S.Ct. at 1250. At the time of the preliminary hearing, he retrieved this mental image and compared it to the defendant and was able, as a result, to positively identify the defendant as the man who had held a gun to his face during the robbery of his home. We are convinced that no part of this observation and recollection process was derived from the illegal

---

**2.** The victim in *Crews* had described her assailant as a young black male, 15–18 years old, approximately 5'5" to 5'8" tall, slender in build, with a very dark complexion and smooth skin.

police conduct which occurred in this case. It appears that the "toxin in this case was injected only after the evidentiary bud had blossomed; the fruit served at trial was not poisoned." *Id.* Finally, the Supreme Court in *Crews* held that the criminal defendant could not challenge his own presence at trial on the grounds that his appearance in court was brought about by an illegal arrest. The court stated that the defendant himself is not a suppressible "fruit" and that an illegal arrest alone does not bar a subsequent prosecution.[3]

More than sufficient evidence exists in the instant case to support the conclusion that the victim of this robbery, Daniel Farrell, had ample opportunity during the commission of this crime to observe the defendant-appellee. The light had been turned on in the room where the victim observed the defendant and his partner. Even though the victim testified that he was only able to look at the defendant for a matter of minutes before he was ordered to turn over and face down in his bed, the relevant factor in terms of our review of the suppression order is that he did in fact personally observe the defendant at the scene of the robbery. The reliability of the victim's in-court identification as evidence which the Commonwealth will presumably present in its effort to convict the defendant of the crimes for which he has been charged is a question to be decided at trial by the fact finder. We therefore conclude that the in-court identification evidence in this case should not have been excluded because it did not derive from the subsequent illegal arrest of the defendant. This evidence was not properly characterized as a fruit of this poisonous tree.

Guiding our decision in this matter is our recognition that evidence obtained in violation of the Fourth Amendment is excluded at trial not because it is nontrustworthy or nonprobative, but to deter law enforcement officials from violating important constitutional safeguards. *Mapp v. Ohio,* 367

---

3. We note that in *Crews* five members of the Court agreed that the defendant's face cannot be considered a suppressible fruit of an illegal arrest in view of prior Supreme Court authority. (per Powell, J., Blackmun, J., White, J., Burger, Ch.J., Rehnquist, J.)

U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The application of the exclusionary rule has been "restricted to those areas where its remedial objectives are thought most efficaciously served." *Stone v. Powell,* 428 U.S. 465, 486, 96 S.Ct. 3037, 3048, 49 L.Ed.2d 1067 (1976). (citing *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561). When the nexus between the unlawful actions of the police and the challenged evidence is a tenuous one, the ability of the exclusionary rule to accomplish its deterrent effect becomes uncertain. It must always be remembered that the application of the exclusionary rule comes at a cost. The exclusionary rule "deflects the truth-finding process and often frees the guilty." *Id.* 428 U.S. at 490, 96 S.Ct. at 3050. While we recognize that the exclusionary rule is an established means by which we deter unlawful police activity and nurture respect for the sanctity of the home and the inviolability of the person, we are convinced that society would suffer a grave disintegration in its administration of criminal justice by the indiscriminate application of the exclusionary rule; specifically, when its application, as here, has absolutely no relationship to the deterrence of police misconduct.

Reversed.